UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMIE A.,[1]

|  |  |  |
|---|---|---|
|  | Plaintiff | DECISION and ORDER |
| -vs- |  | 6:24-CV-6684-CJS |
| COMMISSIONER OF SOCIAL SECURITY, |  |  |
|  | Defendant. |  |

_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review a final determination of the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff's application for Supplemental Security Income ("SSI") benefits.   Now before the Court is Plaintiff's application for judgment on the pleadings (ECF No. 10), seeking remand solely for calculation of benefits, and Defendant's cross-motion for judgment on the pleadings (ECF No. 17).   For reasons discussed below, Plaintiff's application for judgment on the pleadings is granted, to the extent that the matter is remanded for further administrative proceedings.   Plaintiff's request for remand solely for calculation of benefits is denied.   Defendant's cross-motion is denied.

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the United States District Court for the Western District of New York, any non-government party will be identified and referenced solely by first name and last initial."

STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[2] which significantly limits his physical or mental ability to do basic work activities.[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment]. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[4] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[5]

---

[2] "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id*. If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[3] The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[4] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[5] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim, in which "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).

The issue to be determined by the court in such an action is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error

App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert [("VE")]. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986) ("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773; *see also*, 42 U.S.C.A. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tejada v. Apfel*, 167 F.3d at 773 (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec.*, No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the Commissioner's findings unless a reasonable factfinder would *have to conclude otherwise*.")

(emphasis in original; citations and internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have reached the same conclusion as the ALJ."); *Lisette R. o/b/o C.J.O. v. Kijakazi*, No. 3:22-CV-00784-TOF, 2023 WL 6357961, at *3 (D. Conn. Sept. 29, 2023) ("A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner.  When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment.") (citations omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).  "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).  "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different

result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at \*2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

When considering whether a particular finding or decision is supported by substantial evidence, a court also may not rely on any *post hoc* rationalizations offered by the Commissioner.   However, a court may consider evidence that was evidently considered by the Administrative Law Judge ("ALJ") even if it was not expressly mentioned in the administrative decision. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability. *E.g., Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982). In *Berry*, we noted that, although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale "in relation to evidence in the record," we would not remand where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id*.[; [s]*ee also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony ....")."); *see also, Loni S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at \*19 (N.D.N.Y. June 27, 2023) ("The Court is required to look at the entire ALJ's decision when reviewing for substantial evidence. *See John L. M. v. Kijakazi*, No. 5:21-CV-368

6

(BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (citations omitted) ('[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible *post-hoc* rationalization, it may affirm where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.').").

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action. The Court will discuss the facts below only as necessary to address Plaintiff's arguments. Briefly, this is the second time that Plaintiff's claim for benefits has reached federal district court. The first time, the action was assigned to the Honorable David G. Larimer, United States District Judge, who reversed the Commissioner's decision denying benefits, and remanded the action to the Commissioner for further administrative proceedings. *See, Jamie A. v. Commissioner*, 20-CV-6315L, ECF No. 16.

In particular, Judge Larimer found that the ALJ in that administrative proceeding, Paul D. Barker, Jr. ("ALJ Barker"), had not properly applied the "treating physician rule" when deciding to give only minimal weight to medical opinions from two of Plaintiff's primary care physicians, John Alves, M.D. ("Alves") and Heather Underhill, D.O. ("Underhill"). Judge Larimer wrote, in pertinent part:

> Dr. Alves issued an initial opinion in September 2013, followed by a series of virtually identical opinions in October 2013, March 2014, October 2014, September 2016, and February 2017. Dr. Underhill authored two substantially similar opinions in September 2015 and February 2016. Dr. Alves and Dr. Underhill both indicated that plaintiff's fibromyalgia and polyarthritis, and the associated "pain and inflammation in her hands and her lower limbs," caused her to be "moderately limited" in walking, standing, using her hands, sustaining attention and concentration, and working at a consistent pace, and "very

7

limited" in lifting, carrying, pushing, pulling, bending, and climbing. (Dkt. #8-7 at 356-37, 358-59, 360-61, 364-65, 366-67, 371-72, 374-74; Dkt. #8-8 at 419-20). On September 27, 2013, Dr. Alves wrote a brief note indicating that plaintiff's "Fibromyalgia and Rheumatoid Arthritis mak[e] it difficult to accomplish many jobs requiring constant walking, standing, or lifting. Employment requiring limited movement or sitting is recommended for her." (Dkt. #8-7 at 375.)

In two additional, lengthier opinions cosigned by Dr. Alves in July 2013 and July 2014, he stated that due to widespread "severe, daily" pain, muscle weakness, and a host of other symptoms, plaintiff cannot walk for more than 1 city block without pain, can sit for up to 15 minutes at a time for up to 4 hours in an 8-hour workday, can stand for up to 10 minutes at a time for less than 2 hours in an 8-hour workday, can occasionally lift 10 pounds and never lift 20 pounds, can rarely twist or climb stairs, can never stoop or crouch or climb ladders, requires the ability to change positions at will, must take frequent breaks throughout the day, cannot grasp with her hands or reach forward or overhead for more than 5% of the day, cannot perform fine finger manipulations for more than 50% of the day, and is likely to be off-task for more than 25% of the day and miss more than four days of work per month due to symptoms. (Dkt. #8-9 at 568-76).

The ALJ gave "minimal" weight to each of these eleven opinions, finding that although they were rendered by treating physicians, the extent of the opined limitations was inconsistent *with certain objective findings in plaintiff's treatment notes and in Dr. Murgano's [consultative internal medicine] report, which indicated normal gait and strength*. (Dkt. #8-2 at 22).

***

Here, the ALJ's decision to give only minimal weight to the opinions of Dr. Alves and Dr. Underhill was not sufficiently supported. *Initially, the ALJ cited to just three references in treatment notes by Dr. Alves and Dr. Underhill in which normal strength or gait was observed.* It does not appear that plaintiff's strength, gait or dexterity were regularly measured by either physician, and the appearance of three sporadic findings over a course of treatment spanning several years does not lend overwhelming support to the ALJ's conclusion that "the examination notes of Dr. Alves and Dr. Underhill do not support their opinions." (Dkt. #8-2 at 25). Furthermore, to the extent that the ALJ "sense[d] that Dr. [Alves's or Dr. Underhill's RFC] reports may . . . [have been] in tension

8

with [treatment] notes summarizing plaintiff's strength, mobility, and gait," the ALJ was obligated to seek clarification from those physicians, rather than simply rejecting their opinions nearly in toto. *Cahill v. Colvin*, 2014 U.S. Dist. ELXIS 178724 at \*49-\*50 (S.D.N.Y. 2014).

*The ALJ's cavalier rejection of Dr. Alves's and Dr. Underhill's opinions* as "inconsistent" with the medical evidence is particularly conspicuous, given that those opinions were largely consistent with all of the other exertional RFC opinions of record. Primary care physician Dr. Jessie Atkins, consulting examiner Dr. Magurno, and reviewing state agency medical consultant Dr. R. Reynolds, all opined that plaintiff had moderate or marked limitations in walking, sitting, standing, and engaging in certain postural functions. (Dkt. #8-9 at 548-52, 560-61, 615-16). *Each was given no more than "partial" weight by the ALJ, based upon their alleged inconsistency with the same few observations of normal gait and strength the ALJ used to reject Dr. Alves's and Dr. Underhill's opinions.*

In sum, the ALJ rejected the bulk of the exertional limitations that were consistently opined by each and every one of the treating, examining and reviewing physicians of record, *citing only to scant objective findings that the ALJ interpreted as contradictory*. "While the ALJ is not obligated to 'reconcile explicitly every conflicting shred of medical testimony,' [the ALJ] cannot simply selectively choose evidence in the record that supports his conclusions." *Gecevic v. Secretary of Health & Human Servs.*, 882 F. Supp. 278, 286 (E.D.N.Y.1995) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir.1983)). By rejecting the opinions of every medical source on the basis of a suspiciously-recurrent "inconsistency" with *a few objective findings*, without contacting any of those sources to determine whether there was a medical basis to explain the discrepancy, I find that the ALJ improperly substituted his "own expertise or view of the medical proof [in place of] any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

*Jamie A. v. Commissioner*, 20-CV-6315L, ECF No. 16 (emphasis added).[6]   Judge Larimer

---

[6] The undersigned has independently reviewed ALJ Barker's decision and notes, for reasons that will be discussed further below, that the decision does not indicate, either expressly or impliedly, that ALJ Barker believed Plaintiff had attempted to mislead the doctors from whom she had requested evaluations in support

concluded by stating:

> On remand, the ALJ should reassess the evidence of record, contacting medical sources for clarification or soliciting additional consulting opinions where appropriate, and should render a new decision which reassess plaintiff's severe impairments and the limitations posed thereby, provides a detailed explanation of the evidence of record supporting the ALJ's findings, identifies the weight given to each medial opinion of record, applies the treating physician rule, and explains the reasons that specific opined limitations are adopted or rejected.

Id. at 9-10.

Upon remand to the Commissioner, the matter was assigned to a new ALJ, Kenneth Theurer ("ALJ Theurer" or "the ALJ"), and consolidated with another claim for benefits by Plaintiff. Tr. 1078.   On September 21, 2022, and January 27, 2023, the ALJ conducted a new hearing, upon a significantly expanded medical record.   The ALJ also took testimony from two impartial medical experts, Gerald Koocher, Ph.D. ("Koocher") and Joseph Gaeta, M.D. ("Gaeta"), each of whom indicated that he had reviewed the entire medical file.   The ALJ also took testimony from a vocational expert.

At the hearing, Plaintiff essentially testified that she was completely housebound, leaving her house only with her boyfriend, because she was fearful of being attacked by strangers, and that she was essentially completely unable to do most physical activities due to constant physical pain, for which medication did not give her relief.   Plaintiff further indicated that her boyfriend was her primary caretaker.   Plaintiff testified that her boyfriend lived in Brooklyn, but visited her often.   Plaintiff, who was then 31 years of age, admitted

---

of her disability claim.   Rather, as Judge Larimer noted, ALJ Barker gave only little weight to the opinions of Plaintiff's treating doctors primarily because he found that such opinions were inconsistent with certain normal objective findings relating to Plaintiff's strength and gait.

that she had never held a full-time job in her life, which, she indicated, was due to a "lot of reasons," including that she had always had anxiety about being in crowds of people. Tr. 1093-1094.

Medical expert Dr. Gaeta testified at the hearing, that, despite Plaintiff's physical limitations, she could perform less than a full range of light work:

> I think generally a light level restrictions. I guess she could sit for six hours during the course of the day, stand, and/or walk six hours and in the course of the day I think she could occasionally lift, pull, push, carry 20 pounds, frequently ten pounds.
>
> I think she should not climb ladder or scaffolds, but she could do all the other postural elements on a frequent basis except for crawling, which she should not do. I don't see any environmental limitations.
>
> There [is] maybe a question with regarding her hands. I mean she occasionally has problems there so I would limit her, you know, use of hands, primarily for fine type of maneuvers to, you know, frequent rather than, you know, no restriction at all. Should avoid unprotected heights, and dangerous machinery, and I think that would summarize it.

Tr. 1046-1047.   Gaeta testified that he had reviewed the other medical opinions in the file, and, to the extent they referenced greater limitations, felt they were not well supported with actual findings, which caused him to wonder whether they were instead based merely on Plaintiff's reported symptoms. Tr. 1047.   In that regard, Gaeta acknowledged that fibromyalgia, which Gaeta felt was Plaintiff's primary problem, was generally not an illness that was supported by objective findings. Tr. 1048.   Gaeta further indicated that he did not believe the examination results supported Plaintiff's assertion that her pain symptoms had worsened over time. Tr. 1050-1051.

Psychologist Dr. Koocher also testified at the hearing, and indicated that under the paragraph B criteria, Plaintiff had only mild-to-moderate impairments, at most. Tr. 1055. Koocher indicated, for example, that he did not see evidence to support Plaintiff's claim that she was essentially housebound due to her mental impairments. *See*, Tr. 1060-1061 ("Now, obviously if the claimant is having frequent panic attacks or frequent depressive symptoms that would make it difficult for her to get out of the house or go to work, those would be very important factors to consider. But I don't see documentation of any of that in the record."). Koocher further saw no evidence that Plaintiff was limited in her ability to interact with other people. Tr. 1061.   Koocher also testified that despite references to a PTSD diagnosis in certain treatment notes, he did not think that an actual PTSD diagnosis had ever been made, or could be made, based on the information in the record. Tr. 1064-1065.   Koocher further testified that, despite her mild-to-moderate impairments, Plaintiff could perform unskilled work. Tr. 1061.

On February 9, 2023, the ALJ issued a decision finding that Plaintiff was not disabled at any relevant time.   The ALJ's broad findings under the five-step sequential evaluation are summarized in Defendant's memorandum of law, to which description Plaintiff has not objected, as follows:

> At step one of the sequential evaluation, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her October 27, 2015 SSI application date. Tr. 1013. At step two, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia; anxiety disorder; depressive disorder; and post-traumatic stress disorder. Tr. 1013. At step three, the ALJ concluded that none of Plaintiff's impairments met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 1014-16.

12

The ALJ further concluded that Plaintiff had the RFC to perform a range of light exertional work as defined in 20 C.F.R. § 416.967(b), with additional nonexertional and mental limitations. Tr. 1016-17. At step four, the ALJ determined that Plaintiff had no past relevant work. Tr. 1023. The ALJ went to make a step five finding that given Plaintiff's age, education, work experience, and RFC, there were jobs available in the national economy that she was capable of performing. Tr. 1023-24. Accordingly, Plaintiff was not disabled within the meaning of the Act. Tr. 1024.

Def. Memo of Law, ECF No. 17-1 at CM/ECF pp. 4-5.   The ALJ's actual RFC finding was as follows:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). She can occasionally lift and carry, push and pull twenty pounds, frequently lift and carry, or push and pull, ten pounds, sit for up to six hours, stand or walk for approximately six hours in eight-hour day with normal breaks. She can occasionally climb ramps or stairs, ladders, ropes or scaffolds, can occasionally balance stoop, kneel and crouch, but cannot crawl and she can do fine manipulation, such as handling and fingering, no more than frequently. The claimant can perform work limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple, work-related decisions with few, if any, workplace changes, and no more than occasional interaction with coworkers, supervisors, and the public.

Tr. 1016-1017.

In explaining his RFC finding, the ALJ began by noting that he had considered the evidence in accordance with the Commissioner's regulations, including the treating physician rule, 20 C.F.R. sec 416.927. Tr. 1017.

The ALJ then summarized Plaintiff's statements about her symptoms, and indicated that he found them not entirely consistent with the "medical evidence and other evidence in

13

the record." Tr. 1018.   The ALJ summarized Plaintiff's subjective complaints as follows:

> The claimant testified, in September 2022, that her depression and anxiety are increasing, and her physical health is worsening. She has numbness in the lower extremities, migraines, falls frequently, and uses a cane, though this [cane] is not prescribed (2022 Hearing). She has pain and swelling in her hands, cannot lift more than 5 lb., and cannot stand more than 10 minutes, and cannot walk more than 2 ½ blocks (2022 Hearing). She is afraid of people, is housebound, and uses a cane; her boyfriend, who lives in Brooklyn, cares for her, including doing the household chores, and shopping (2022 Hearing).

Tr. 1017.   The ALJ indicated, however, that the evidence overall did not support those statements.   First, regarding physical impairments, the ALJ stated that treatment notes contained normal findings that did not support Plaintiff's claim of being in constant pain, such as notations that Plaintiff appeared to be in no distress, had a normal gait, and was reported to have "painless range of motion in all major muscle groups and joints." Tr. 1018.   The ALJ also referenced evidence that he felt indicated Plaintiff had exaggerated her symptoms during office visits, when seeking to have disability forms completed, such as by bringing a non-prescribed cane to ambulate. *See, e.g.,* Tr. 1018 ("On September 1, 2022, the claimant saw her primary care provider to have disability forms completed; on this occasion she presented with a cane and had reduced strength and reduced sensation.   However, when seen by a new provider [the following day,] on September 2, 2022, a normal gait was observed, and there is no indication of [the claimant using] an assistive device.").

Regarding Plaintiff's mental impairments, the ALJ indicated that he found Plaintiff's sincerity in pursuing mental health treatment to be dubious, since, during the first several years of her alleged period of disability, she expressly linked her attendance at treatment visits with her intention of obtaining SSI benefits, and, in between stints of mental health

14

treatment, denied mental health symptoms:

> [T]he claimant sought mental health treatment in January 2014, reporting a treatment goal of being approved for SSI.[7]   The claimant was diagnosed with anxiety and depressive disorders, and participated in treatment for several months, with a good prognosis, though she stopped taking the prescribed medications (C7F/13-15). From January 2014 until January 2017, the claimant consistently denied psychiatric symptoms including anxiety, depression and sleep problems and mental status examinations were normal, though the claimant reported insomnia, controlled with Ambien (e.g., C6F/16, 19, C8F/15, 19-20, 25, 34, C28F/28, 88). In January 2017, the claimant again sought mental health services, telling the intake evaluator that her "lawyer for SSI recommended she come in "regularly" (C12F/5).

Tr. 1018.   The ALJ further noted that while Plaintiff told treatment providers that she could not leave her house due to PTSD and anxiety, she admitted taking "regular trips to New York City, by bus, to visit her boyfriend and seek housing in the city." Tr. 1019.[8]   The ALJ also referenced the fact that during a consultative psychiatric evaluation on January 18, 2021, the examiner, who had previously examined Plaintiff, expressed concern that Plaintiff was malingering, since Plaintiff's testing performance during that day's examination was notably different than what she had displayed at the prior examination, and, that Plaintiff's presentation during the later consultative examination was also inconsistent with how Plaintiff appeared at visits with her treatment provider during the same period. *See*, Tr. 1019 ("The consultative examiner noted inconsistencies in the examination, compared to prior

---

[7] Plaintiff stated that obtaining SSI benefits was her primary "life goal," and not just the goal of treatment. Tr. 368.   Plaintiff stated that her primary treatment goal was, "Decreasing anxiety and depression so I can be me again." *Id*.    When asked to state how she would know if she had achieved her treatment goal, Plaintiff wrote: "When I feel better most days and get some money in my pocket." Tr. 369.

[8] Of further note, while Plaintiff testified that her boyfriend was her primary caretaker, and that she usually could not leave her house without him, treatment notes indicate that Plaintiff's boyfriend was in jail at various times.

consultative examination, and expressed concerns for malingering, and deliberate attempts to look more impaired than she actually is (C48F/3). The record shows inconsistencies between the claimant's reported symptoms and performance on this examination, compared with an examination by her psychiatric provider 3 days earlier and another 6 weeks later (C51F/19, 21-22).").

The ALJ further indicated that he found Plaintiff's activities of daily living, such as her ability to travel to New York City by bus, was inconsistent with her reports about her symptoms. *See*, Tr. 1019 ("Although the claimant has sometimes reported a fear of leaving home the claimant has informed care providers of taking regular trips to New York City, including travel by bus (see, e.g., C33F/42, C36F/8, 9, 46, 57, C51F/44). The claimant has told care providers that her mood improves noticeably once she is out of the house, and she does not have panic attacks while she is out, though on another occasion she reported that she gets panic attacks when she travels (C51F/8, 13).").   The ALJ found that, overall, and based on the factors just discussed, Plaintiff's "reports of her activities are not entirely consistent with disabling restrictions, whether physical or mental." Tr. 1019.

The ALJ also discussed the medical opinion evidence and how it factored into his RFC finding. Tr. 1020-1022.   Notably, in that regard, the ALJ gave greater weight to the opinions of the non-examining medical experts who testified at the hearing, and to the opinions of other non-treating, non-examining consultative physicians, than to the opinions of Plaintiff's treating doctors, and especially an opinion from Plaintiff's primary care physician, Marta Hernandez-Hermann, M.D. ("Hernandez-Hermann"), after finding that the treating physicians' opinions were less consistent with the medical evidence overall.

16

For example, the ALJ found that the opinions of the non-examining medical experts, Drs. Gaeta and Koocher, were persuasive since they were consistent with the medical evidence, stating, in pertinent part:

> These opinions are afforded substantial weight. Though they did not examine the claimant, both are familiar with Agency policies and evidentiary requirements, and both had the opportunity to review the entire record, including the reports of the consultative examiners, the treatment records of all providers, and the other opinions rendered in this matter. They both provided extensive testimony regarding the claimant's condition, were cross examined by the claimant's representative, and both cited to specific findings in the record that support their opinions. Though I have adopted slightly different limitations, these assessments are persuasive depictions of the claimant's functioning, which reflect both the clinical findings, as well as the claimant's reported activities of daily living.

Tr. 1020.  The ALJ noted that Gaeta was "a board-certified internist with over 50 years of practice experience," and that Koocher was "a psychologist with significant practice experience, including research on adaptation to chronic illness." Tr. 1020.

The ALJ found that the opinions of several state agency review consultants, concerning Plaintiff's physical limitations, were entitled to only "some weight," since they were inconsistent, and since the evaluators had not reviewed the entire medical filed. Tr. 1020 ("[T]hey did not review the whole record, and although the evidence indicates that the claimant's physical impairments are not of disabling severity, the record does not support a finding claimant is completely unrestricted in her functioning.").

The ALJ found that the opinion of Justine Magurno, M.D. ("Magurno"), who performed a consultative internal medicine examination, was "afforded less weight," since it "consider[ed] impairments that [were] not supported by her examination, or by the medical

17

evidence of record," and "overstate[d] the claimant's limitations." Tr. 1020.   In that regard, Magurno had opined, based on Plaintiff's reported symptoms, that Plaintiff was primarily limited by migraine headaches, Tr. 551, which the ALJ found was not a severe impairment. Magurno otherwise opined that Plaintiff would have only "moderate" limitations from any physical impairment.   In particular, Magurno noted that Plaintiff reported pain at eighteen out of eighteen possible fibromyalgia "trigger point" locations, but nevertheless opined that, from the examination overall, Plaintiff would have only "moderate limitations for bending, lifting, carrying, pushing, and pulling." *Id*.

The ALJ found that the opinions of state agency review psychologists concerning Plaintiff's mental limitations, generally indicating moderate limitations, were entitled to substantial weight, since they were generally consistent with each other and the record, as well as with the testimony of Dr. Koocher. Tr. 1021.

The ALJ found that the opinions of Amanda Slowik, Ph.D. ("Slowik"), who performed two different consultative psychiatric examinations of Plaintiff, were entitled to "some weight," since, insofar as they opined moderate limitations, they were consistent with the record overall and with the opinions of the agency review physicians. Tr. 1021.   However, the ALJ rejected Slowik's opinion that Plaintiff would have marked limitation in her ability to follow complex instructions. *Id*.   The ALJ also gave less weight to the opinion of consultative examiner Sara Long, Ph.D. ("Long"), who essentially opined that Plaintiff had no mental impairment, except for a mild limitation in regulating emotion. *Id*.

Regarding the opinions of Plaintiff's treating physicians, the ALJ rejected some outright, as either being clearly based entirely on Plaintiff's subjective complaints, or as

18

failing to account even for Plaintiff's moderate limitations. *See, e.g.*, Tr. 1021 ("The opinion of Avanti Puri, M.D., from September 2, 2022, is also given little weight; this letter was provided to the claimant the first time Dr. Puri saw her and reflects the claimant's subjective report of her history and symptoms, rather than his professional assessment.   Nimmy Simon, M.D., reported that the claimant is moderately limited in her ability to work at a consistent pace, but found no limitations in other areas, including physical limitations.").

The primary point of contention in this action, however, involves the ALJ's assessment of the treating opinions of Plaintiff's primary care physicians, Drs. Alves, Underhill, and Atkins, mentioned earlier in the discussion of Judge Larimer's decision, and Hernandez-Hermann, with whom Plaintiff began treating after Alves and Underhill. Regarding these opinions, the ALJ stated, in pertinent part:

> Dr. Hernandez-Hermann wrote that the claimant is limited in all four broad areas of mental functioning; she provided greater detail in a later statement, specifying moderate limitations in concentration, understanding instructions, maintaining socially appropriate behavior, and keeping a consistent pace (C42F/1-4. C43F). In a 2022 assessment, she opines that the claimant has rather extreme physical limitations, including an inability to perform any postural tasks (C61F). Dr. Jessica Atkins identified greater restrictions, asserting that the claimant is very limited in understanding and remembering instructions, and in maintaining attention and concentration (C38F). The mental assessments by these providers are afforded some weight, as these are generally consistent with each other, and with the clinical record; The opinion of Dr. Hernandez-Hermann is inconsistent with the record as a whole and is, therefore, afforded little weight. (Ex. D2F, p. 43; Ex. D16F, p. 5). A letter opinion, from John Alves, MD from September 2013, assessing some limitations for constant walking standing and lifting, is afforded some weight; however, a checkbox form dated July 1, 2014, finding extreme limitations is less consistent with the record and is afforded little weight.[9]  I note that both of

---

[9] This form is found at Tr. 568-576 (Exhibit C23F at pp. 2-11).

these assessments predate the application date and, therefore, are less persuasive with respect to the period from October 2015.

*** 

Checkbox forms completed for the Department of Social Services over the period have been reviewed and are afforded little weight as they are brief, conclusory forms without sufficient narrative explanation or referral to clinical and diagnostic findings. These include assessments by Heather Underhill, DO, from September 3, 2015 and February 18, 2016, opinion from an illegible provider from 2015; opinions of John Alves, MD from October 14, 2013, November 15, 2013, March 24, 2014, October 3, 2014, and September 1, 2015, June 12, 2016; opinions of primary care provider Jessie A[t]kins DO from March 1, 2017, and March 13, 2019; and opinions of primary care provider Marta Hernandez-Hermann, MD, from March 16, 2020 and September 23, 2021 and (C7F, C9F, C25F/3, C38F/4-5, C31F/3-4, C38F/2-3, 4-5, 6-7, C57F).

Tr. 1021-1022.

Plaintiff appealed the ALJ's adverse determination, but the Appeals Council declined to review the ALJ's decision. Tr. 994-997.   Therefore, ALJ Theurer's decision became the Commissioner's final decision.

Plaintiff subsequently commenced this action.   Plaintiff here does not challenge the ALJ's findings at the first three steps of the sequential evaluation, but, rather, primarily challenges how the ALJ weighed the medical opinion evidence when making his RFC finding.   Plaintiff essentially maintains that she is disabled due to fibromyalgia and/or Rheumatoid Arthritis, which limits her ability to stand, walk without a cane, and use her hands, and to mental health problems that cause her to isolate herself "to an extreme degree."   Plaintiff further maintains that her anxiety and depression "magnify" her physical pain, limiting her exertional and non-exertional abilities.[10]

---

[10] Regarding Plaintiff's allegations concerning her physical functional limitations, *see, generally*, her Memo of Law, ECF No. 10-1 at p. 5 ("Ms. Adams is able to stand for about a half an hour before she has to sit as the

Plaintiff contends that the ALJ's contrary decision is affected by errors of law, and unsupported by substantial evidence, since the ALJ failed to properly apply the treating physician rule when evaluating the medical opinion evidence. Specifically, Plaintiff asserts that it was error for the ALJ to give the greatest amount of weight to medical opinions from state agency consultants and experts who never examined Plaintiff, while giving only little weight to the opinions of Plaintiff's treating physicians, especially the opinions of primary care physicians Alves, Underhill, and Hernandez-Hermann. According to Plaintiff, the ALJ should have given controlling weight to those treating physicians' opinions, since they were consistent with each other and with the record as a whole.

Conversely, Plaintiff asserts that the opinions of the non-treating, non-examining doctors upon which the ALJ relied to make his RFC finding do not, as a matter of law, constitute substantial evidence to support that finding. [11] Plaintiff maintains that the perceived inherent unreliability of opinions by non-examining physicians is particularly applicable to the opinions of non-treating psychologists, given "the inherent subjectivity" psychiatric diagnoses.

Plaintiff also maintains that, in addition to erring by giving more weight to non-

---

aching in her feet and legs becomes overwhelming, and she has to elevate her legs to prevent fluid build-up. R 56-57. Ms. Adams can only walk for about a half an hour before she must stop and rest, and as her pain has gotten worse she has become gradually weaker and less able to lift, testifying she can only lift five to seven pounds. R 57. In 2022, Ms. Adams testified the pain and cramping in her hands had worsened to the point that they cramp into a fist and she is unable to open her hands flat. R 1087. This limits her ability to use her hands, and Ms. Adams testified she cannot lift a gallon of milk. R 1087."). Regarding her mental limitations, Plaintiff asserts that they rob her of the "ability to leave her house and navigate the world." *Id*. at 7.

[11] *See, e.g.*, Pl. Memo of Law, ECF No. 10-1 at p. 25 ("The ALJ's heavy reliance [on] the opinions of non-examining consultants does not constitute substantial evidence to reject the consistent and detailed opinions of [Plaintiff's] treating physicians and examining providers.").

examining opinions than to examining/treating opinions, the ALJ, upon deciding not to grant controlling-weight to the opinions of treating doctors, failed to apply the *Burgess* factors when explaining the weight he gave to the treating opinions, as required by the treating physician rule, 20 CFR § 416.927(c)(2).   Plaintiff asserts that, by failing to apply those factors, the ALJ not only violated the treating physician rule, but he also violated the directions, given by Judge Larimer when he remanded the action, to properly explain the weight given to the opinions of treating doctors that were not given controlling weight.

Plaintiff further contends that the ALJ impermissibly "cherry picked" evidence to support the RFC finding and/or "arbitrarily substituted his own judgment for competent medical opinion."[12]   Indeed, Plaintiff asserts that "[t]he ALJ's decision . . . is an improper override of the opinions of [Plaintiff's] treating physicians' opinions in order to reach the ALJ's desired conclusion of denying [Plaintiff] SSI benefits."[13]

Plaintiff insists that the foregoing alleged errors are not harmless, since the treating physicians' opinions, if properly credited, would result in a finding of disability, and that the Commissioner's decision must therefore be reversed.   Plaintiff also contends that, considering the lengthy procedural history of this action, further administrative proceedings would be pointless, and that the matter should be remanded solely for calculation of benefits.

Defendant Commissioner disagrees, and maintains that the ALJ's decision is free of error and supported by substantial evidence.   Defendant contends that the ALJ complied with Judge Larimer's decision, since "the ALJ properly evaluated the medical

---

[12] Pl. Reply, ECF No. 20 at p. 2.
[13] ECF No. 20 at p. 8.

opinion evidence in the record pursuant to the regulations and reached an RFC finding that is supported by substantial evidence in the record, including the medical expert opinion evidence." Def. Memo of Law, ECF No. 17-1 at p. 10.

Defendant further contends that Plaintiff is incorrect to argue that the opinions of agency review physicians and non-examining experts cannot provide substantial evidence to support an RFC finding. *See, id*. at 8 ("Plaintiff's argument is simply that non-examining sources such as State agency consultants and medical and medical examiners are only entitled to little or no weight."). Defendant maintains, rather, that such opinions can override treating sources' opinions if they are supported by substantial evidence in the record, which is the case here. *Id*. at 9.

Defendant further indicates, in that regard, that the mental aspect of the RFC finding is properly supported by the opinions of agency review psychologists (Marks, Ferrin, Sherer) and Koocher, who, despite not treating or examining Plaintiff, all found that Plaintiff had no more than moderate limitations in mental functioning. *Id.* at 9. Defendant also states that the mental portion of the RFC finding is consistent with the opinions of Drs. Atkins and Hernandez-Hermann, which the ALJ gave "some weight," but not controlling weight. *Id*. at 6 ("Indeed, the generally moderate mental limitations opined by Dr. Hernandez-Hermann and Dr. Atkins support the mental limitations in the RFC, including simple, routine and repetitive tasks without fast-paced production requirements, only simple work-related decisions, few workplace changes, and no more than occasional contact with supervisors, coworkers, and the public.").

The Court has carefully considered the parties' submissions and the relevant portions

23

of the record.   For reasons discussed further below, the Court finds that remand is required for further administrative proceedings.

DISCUSSION

Plaintiff's claim was filed prior to March 27, 2017, meaning that the ALJ was required to follow the treating physician rule when evaluating the medical opinion evidence:

> For claims filed prior to March 27, 2017, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). However, the opinion of a treating physician is not afforded controlling weight where the treating physician's opinion is contradicted by other substantial evidence in the record, such as the opinions of other medical experts. *See Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). In that situation, "'the ALJ must explicitly consider, *inter alia*: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist.'" *Greek*, 802 F.3d at 375 (*quoting Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)); *see also* 20 C.F.R. § 404.1527(c). The ALJ must then "'comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion.'" *Id*. (*quoting Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)). "The failure to provide "'good reasons'" for not crediting the opinion of a claimant's treating physician is a ground for remand.'" *Id*. (quotation omitted).

*Tina W. v. Comm'r of Soc. Sec.*, No. 5:22-CV-15 (MAD), 2023 WL 157952, at *6 (N.D.N.Y. Jan. 10, 2023).

Where an ALJ does not give a treating source's opinion controlling weight, the ALJ's subsequent failure to explicitly discuss the "*Burgess* factors" is a "procedural error," though the error may be deemed harmless if a "searching review of the record" assures the

24

reviewing court that the substance of the treating physician rule was followed. *See,*

*Hamilton v. Comm'r of Soc. Sec.*, No. 22-612-CV, 2023 WL 2395931, at *1–2 (2d Cir. Mar.

8, 2023) ("An ALJ's failure to explicitly apply the *Burgess* factors when assigning weight ...

is a procedural error.... If, however, a searching review of the record assures us that the

substance of the treating physician rule was not traversed, we will affirm.") (*quoting*

*Estrella v. Berryhill*, 925 F.3d 90, 95–96 (2d Cir. 2019), other citation omitted).

Indeed, even where an ALJ purports to apply the *Burgess* factors, his failure to

expressly discuss each factor is not a basis for remand, provided that his reasoning is

otherwise clear. *See, Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ("Atwater

challenges the ALJ's failure to review explicitly each factor provided in 20 C.F.R. §

404.1527(c). We require no such slavish recitation of each and every factor where the

ALJ's reasoning and adherence to the regulation are clear. *See Halloran v. Barnhart*, 362

F.3d 28, 31–32 (2d Cir.2004) (per curiam) (affirming ALJ opinion which did "not expressly

acknowledge the treating physician rule," but where "the substance of the treating

physician rule was not traversed.").").

Along with these principles, it is also well settled that an ALJ must generally provide

an adequate explanation for his decision:

> Courts in this Circuit have indicated that ALJs must not only identify supporting
> evidence, they also must build an accurate and logical bridge from that
> evidence to the conclusion.   In sum, while ALJs are not required to reconcile
> every conflicting shred of medical testimony, they must discuss the evidence
> and factors crucial to the disability determination with sufficient specificity to
> enable this Court to decide whether the determination is supported by
> substantial evidence.

*Orlando Christopher D. v. Commissioner*, No. 1:24-CV-01526 (PJE), 2026 WL 494026, at *8 (N.D.N.Y. Feb. 23, 2026) (citations and internal quotation marks omitted); *see also, Terrence S. B. v. Comm'r of Soc. Sec.*, No. 1:22-CV-0380 (JJM), 2024 WL 4131237, at *5 (W.D.N.Y. Sept. 10, 2024) ("ALJ Bell's explanation was sufficiently specific to satisfy his obligation 'to construct an accurate and logical bridge between his recitation of the facts and the conclusions he reached.'") (citation omitted).

However, it is similarly well-settled that "this principle supplies *a basis for remand* only when the link between evidence and conclusion is so opaque as to frustrate review." *Lisette R. o/b/o C.J.O. v. Kijakazi*, No. 3:22-CV-00784-TOF, 2023 WL 6357961, at *6 (D. Conn. Sept. 29, 2023) (emphasis added).   In this regard, to be sufficient, the ALJ's explanation need only allow the Court to understand the ALJ's reasoning, and be supported by substantial evidence. *See, Lisette R. o/b/o C.J.O. v. Kijakazi*, No. 3:22-CV-00784-TOF, 2023 WL 6357961, at *4 (D. Conn. Sept. 29, 2023) ("[The ALJ's] discussion, while not lengthy, is nonetheless sufficient to permit the Court to understand his reasoning: he thought that the data in the school records suggesting a marked limitation were outweighed by other data suggesting a lower level of limitation."); *see also, Tami B. v. Comm'r of Soc. Sec.*, No. 3:21-CV-01460 (JCH), 2023 WL 2403898, at *8 (D. Conn. Mar. 7, 2023) ("[A] district court must remand where the ALJ's decision was not thoroughly explained in a manner that allows the court to be comfortable that it was supported by substantial evidence.").

With these principles in mind, the Court now turns to Plaintiff's primary argument, which is that remand is required since the ALJ failed to properly evaluate the opinions of Plaintiff's treating doctors as required by the treating physician rule.   Preliminarily, insofar

26

as Plaintiff maintains that, with proper application of the treating physician rule, the ALJ would have been required to give controlling weight to the opinions of the treating physicians, the Court disagrees, for reasons that it will discuss further below when explaining why remand solely for calculation of benefits is not warranted.

However, the Court agrees that the ALJ failed to properly apply the treating physician rule when explaining the weight that he gave to the opinions of Alves, Underhill, Atkins, and Hernandez-Hermann.   The ALJ's explanation is cursory and does not explicitly apply the *Burgess* factors to those doctors' opinions. Tr. 1021-1022.   For example, when giving Hernandez-Hermann's physical RFC opinion only "little weight," the ALJ gave only a one line explanation, namely, "The opinion of Dr. Hernandez-Hermann is inconsistent with the record as a whole and is, therefore, afforded little weight." Tr. 1022.   The ALJ provided a similarly terse explanation for rejecting Alves's opinions. Tr. 1022.   In sum, the ALJ failed to properly apply the treating physician rule.

Furthermore, this is not a case where the Court can find that the error is harmless because the ALJ's rationale is otherwise clear and the findings are supported by substantial evidence.   In the first place, the ALJ's rationale is not entirely clear.   The ALJ's purported reason for affording little weight to the treating opinions is that they are inconsistent with the record as a whole, but the ALJ devotes little discussion to any such actual inconsistencies. The ALJ seemingly devotes more discussion to evidence he interprets as showing that Plaintiff has consistently attempted to mislead treating and consulting doctors into believing that she is more disabled than she really is, which, if supported, would be a good reason to discount the treating doctors' opinions.   However, that is not the reason the ALJ gave, and,

27

consequently, the Court finds that the ALJ's true rationale for giving the treating physicians' opinions less than controlling weight is somewhat ambiguous.

Moreover, even assuming *arguendo* that the ALJ's reasoning was more clear, there is also a question as to whether the ALJ's finding, concerning the weight of the medical evidence, is supported by substantial evidence.   In that regard, the ALJ's decision indicates that he called Gaeta and Koocher to testify because the opinion evidence of record to that point was inconsistent. *See*, Tr. 1020 ("Regarding the opinion evidence, there are numerous opinions, reflecting inconsistent opinions throughout the period.    Given these inconsistencies, opinions of medical experts were sought.").   Accordingly, it is clear that the ALJ's RFC finding relies heavily on Gaeta's testimony to resolve the alleged inconsistency of the opinions concerning Plaintiff's physical impairments.

However, it is unclear whether Gaeta's testimony supports the RFC finding.   Upon direct examination by the ALJ, Dr. Gaeta testified that, "based upon [his] review of the *objective medical evidence*," he felt Plaintiff was capable of performing a restricted range of light work. Tr. 1046 (emphasis added).   Gaeta also testified that he did not find the greater limitations in other medical opinions in the record convincing, inasmuch as they were not supported by *objective testing.*   Gaeta based his opinion on the lack of objective evidence, even while acknowledging that fibromyalgia is a diagnosis not supported by objective findings:

> [ALJ:] There's a number of source statements within in the file that opine significantly more limitations [than what you have identified].
>
> [Gaeta:] Yes. Actually those, you know, unfortunately, you know, I don't think they're backed up with, you know, *actual objective physical findings*. You

28

know, I wonder whether some of those are made on the bases of *symptoms*, which are very profound and significant but again wherever you see physical examinations maybe outside of, you know, swelling in the fingers at times. I don't see that she has, that those are supported by *objective*, either physical findings, laboratory findings, or x-rays[.]

Tr. 1047.   Upon cross-examination, by Plaintiff's attorney, Gaeta testified, in pertinent part, as follows:

[Attorney:] *Is it possible that she could have those symptoms and the pain that she has [been] reporting despite the, you know, maybe limited testing or findings that you spoke of, the objective finding?*

[Gaeta:] *Well sure, I mean that's actually, you know, fibromyalgia, is defined, you know, that way usually, is it, you know, it's significant symptomatology unsupported by, you know, objective findings. That's what, you know, that's* what is fibromyalgia is assessed along with the tender points.

[Attorney:] Okay. And so, you know, obviously, as you said, you know, there's significant symptomatology and, you know, people with something like fibromyalgia can have good days and bad days. Other than, you know, or given that[,] has she been consistent in her reports to treatment providers?

[Gaeta:] Yes, I would say so. Now let me say that she was being followed by a rheumatologist, you know, and they felt that they really couldn't do much more for her, you know, other than give her the, you know, pain medication, but yes, it is consistent in her, you know, reporting those symptoms.

\*\*\*

[Attorney:] Sure. So, you said that she would be able to sit, stand and walk for six hours, you know, each out of a day, would that be unpredictable? Like would she need to be able to change position at will or is that something that, you know, could be predictable?

[Gaeta:] *Well by symptoms it would not be predictable, you know, by symptoms it would be days that she couldn't do that.*

[Attorney:] *So, there might be days where she --*

29

[Gaeta:] *And it does say based on symptoms, yes.*

[Attorney:] *Okay. So, there might be days where she couldn't sit or stand or walk for six hours in a given day?*

[Gaeta:] *I think she would be able to do that every day but there would be days where because of symptoms she couldn't do it, but if you examined her on those days she would be able to do it.*

Tr. 1048-1050 (emphasis added).

By drawing this distinction between "objective findings" and "symptoms," Gaeta seems to be indicating that he did not consider Plaintiff's symptoms, that is, her alleged pain from fibromyalgia, when formulating his opinion.   Gaeta further seems to be indicating that Plaintiff might not be able to work on certain days due to her pain symptoms, but that he would nevertheless consider her able to work on such days, due to an absence of objective findings.

The ALJ did not ask Gaeta any clarifying questions, even though Gaeta's testimony was unclear, both as to whether he had based his opinion about the limiting effects of Plaintiff's fibromyalgia solely on the lack of objective findings, and as to whether Plaintiff could perform work consistent with the RFC on a sustained basis.   Consequently, and without some clarification, the Court does not have a high degree of confidence that Gaeta's testimony supports either his opinion or the ALJ's RFC finding.

For the various reasons just discussed, the Court finds that remand is required. Plaintiff contends that remand solely for calculation of benefits is required, since "application of the correct legal principles to the record could lead to only one conclusion," namely, a

30

finding of disability. Pl. Memo of Law, ECF No. 10-1 at p. 25.   However, the Court disagrees, inasmuch as the record does not overwhelmingly indicate that Plaintiff is disabled. *See, e.g., Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Of course, where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration. *See Havas v. Bowen, supra*, 804 F.2d at 786. Unlike the situation in *Havas*, however, where no substantial evidence contradicted the treating physician's opinion that the claimant could not return to his prior employment, the present record does not compel but one conclusion under the treating physician rule and the substantial evidence standard.").

In this regard, the opinion most supportive of Plaintiff's disability claim appears to be the one by her treating primary-care physician, Hernandez-Hermann, dated September 1, 2022. Tr. 3609-3613.   The opinion, if accepted, would clearly be work-preclusive, since it indicates that, due to her fibromyalgia, Plaintiff needs to lie down during the day; can sit for only one hour during an eight-hour workday; can stand and/or walk for less than one hour in an eight-hour workday; can never lift or carry more than five pounds; can never bend, squat, crawl, climb, or reach; can only occasionally handle, finger, push, or perform repetitive movements; will have good and bad days, and will miss more than four days of work per month. Tr. 3611-3613.   The report further indicates that, due to mental impairments, Plaintiff, who purportedly has never driven a car, would be completely unable to travel by public transportation. Tr. 3611.

However, it is evident that this opinion is based primarily, if not entirely, on Plaintiff's subjective reports, including her reports of experiencing pain at trigger points, which is, of

course, how fibromyalgia is diagnosed.   On this point, Hernandez-Hermann writes:

> *Patient admits to* fatigue, generalized weakness, progressing, worse in hands, *and now*, lower extremities, pain in specific trigger points (such as hands, feet, shoulders, ankles, knees-posterior.   Limitations in daily activities such as grooming (shaving), cooking, dress, etc. due to weakness and pain.   *She also reports* nightmares and flashbacks related to prior trauma, panic attacks and poor sleep; hypervigilance and feeling afraid in her home due to issues w/ landlord, as well as outside of her home.   Financial difficulties are an ongoing stressor.

Tr. 3610.   Hernandez-Hermann acknowledges that there are no objective findings to support her opinion.   In that regard, she notes that, since 2013, Plaintiff's rheumatological testing has been normal, and that all x-rays have similarly been normal. Tr. 3609.   When asked to explain the findings that support her opinion, Hernandez-Hermann wrote: "Weakness in hands and lower extremities, alongside pain limit ADLs.   Patient comes into office today using cane to assist w/ ambulation." Tr. 3609.   However, Hernandez-Hermann indicates that even her statement about Plaintiff's "worsening" pain in her hands and lower extremities is based on what Plaintiff told her that day, and not on anything Hernandez-Hermann observed. Tr. 3609 ("Patient reports progressively   worsening pain and weakness in lower extremities and hands[.]").

At most, Hernandez-Hermann indicates that fibromyalgia *could* well explain Plaintiff's reported symptoms, even in the absence of positive findings, stating, "fibromyalgia can cause widespread pain, fatigue, sleep disturbances in the absence of joint swelling, inflammation and normal lab tests." Tr. 3610.   At the same time, Hernandez-Hermann seems unsure of what actually might be causing Plaintiff's reported complaints, since she states: "Patient's [reported] motor abnormalities are currently being worked up to rule out

32

other underlying condition." Tr. 3610.    It is apparent, though, that any such condition would not include rheumatoid arthritis, which some of Plaintiff's doctors previously thought Plaintiff had, since Hernandez-Hermann acknowledges that "repeat immunological tests [for that condition] have been normal" since 2013. Tr. 3609.

In any event, this work-preclusive opinion by Hernandez-Hermann is not consistent with her prior reports, in which she reported only moderate limitations.    For example, on March 30, 2020, Hernandez-Herman completed a functional assessment in which she indicated that Plaintiff had, at most, moderate limitations in walking, standing, sitting, lifting, carrying, pushing, pulling, bending, using hands, climbing, understanding instructions, carrying out instructions, maintaining social behavior, and functioning in a work setting. Tr. 4260.    Indeed, Hernandez-Hermann indicated that Plaintiff had no limitation in making simple decisions or interacting with others, and that Plaintiff was *not* "very limited" in *any* category of mental or physical functioning. *Id*.    On September 23, 2021, Hernandez-Hermann issued an almost identical report, again indicating that Plaintiff had no more than moderate limitations in any category of physical or mental functioning. Tr. 3518.    Notably, these prior assessments by Hernandez-Hermann are largely consistent with the opinion of Plaintiff's prior treating physician Jessie Atkins, D.O. ("Atkins"), who, on March 13, 2019, reported that Plaintiff had no more than "moderate" limitations in any category of physical functioning. Tr. 3067, 4033.[14]

---

[14] Unlike Hernandez-Hermann, Atkins opined, without explanation, that Plaintiff was "very limited" in just two categories, namely, "understanding and remembering instructions," and "maintaining attention/ concentration." Tr. 3067.   However, on August 10, 2020, Hernandez-Hermann opined that, despite having some limitation in her ability to maintain concentration and persistence, Plaintiff was "able to follow instructions." Tr. 3178.

In fact, prior to her opinion written on September 1, 2022, Hernandez-Hermann's functional reports were less-restrictive, regarding physical limitations, than most of those written by Drs. Alves and Underhill, the primary care physicians with whom Plaintiff treated prior to Drs. Atkins and Hernandez-Herman.   For example, on September 12, 2016, Dr. Alves, who was then operating with the understanding, later disproven by testing, that Plaintiff had inflammatory arthritis, *see, e.g.*, Tr. 375, stated that Plaintiff was "very limited" in lifting, carrying, pushing, pulling, bending, climbing. Tr. 357; accord, Tr. 359 (Assessment by Dr.Underhill dated February 18, 2016).

It is interesting to note, however, that in those same reports, Alves and Underhill consistently reported that Plaintiff had no limitation whatsoever as to sitting, and only moderate limitations in standing and walking. Tr. 357, 359, 361, 363, 365, 367, 372, 374, 3069.[15]

With few exceptions, Alves and Underhill also consistently opined that Plaintiff had "*no* evidence of limitation" in most areas of mental functioning. *See, e.g.*, Tr. 357, 359, 361, 365, 367, 372, 374, 3069.   Rather, in those reports, Alves and Underhill repeatedly indicated that Plaintiff was only moderately limited in just two categories of mental functioning, namely, maintaining attention and concentration, and functioning in a work setting at a consistent pace. *Id*.

---

[15] The consistency of these opinions on this point clarifies the earlier opinion by Alves in 2013, mentioned in Judge Larimer's decision, in which Alves opined that, "Fibromyalgia and Rheumatoid Arthritis mak[e] it difficult to accomplish many jobs requiring constant walking, standing, or lifting. Employment requiring limited movement or sitting is recommended for her." (Dkt. #8-7 at 375.).   The Court initially thought that, contrary to his later opinions, Alves was stating there that Plaintiff needed a job that required "limited movement" *and* "limited sitting."   However, it is now evident that Alves meant Plaintiff needed either a job with limited "movement," meaning limited walking, standing, and lifting, or a job primarily involving sitting.

34

Hernandez-Hermann's September 1, 2022 opinion is also inconsistent with an opinion by Dr. Magurno, who, as mentioned earlier, conducted a consultative internal medicine exam at the Commissioner's request, Tr. 548-552, and found that Plaintiff would have only "moderate limitations for bending, lifting, carrying, pushing, and pulling," with no limitation found for sitting, standing, or walking. Tr. 551.[16]

Hernandez-Hermann's work-preclusive opinion does not purport to be based on any new or worsening medical findings or testing.  Rather, the inconsistency between such report and Hernandez-Hermann's earlier reports, and the other reports just mentioned, is apparently explained, in Hernandez-Hermann's opinion dated September 1, 2022, by the fact, noted earlier, that Plaintiff told Hernandez-Hermann that her symptoms were "progressively worsening." *See*, Tr. 3609 ("Patient reports progressively worsening pain and weakness in lower extremities and hands affecting activities of daily living.").  Hernandez-Hermann does not seem to offer any explanation for why Plaintiff's symptoms would be worsening, other than that Plaintiff told her she was having more problems in her personal life and with her mental health. *See*, Tr. 3610 ("Psychosocial factors substantially impact on prognosis and outcome of fibromyalgia.").

In sum, rather than finding that the evidence points in only one direction, as Plaintiff maintains, the Court finds that there are significant inconsistencies in the opinion evidence that need to be resolved by further administrative proceedings.[17]   Indeed, the inconsistency

---

[16] Indeed, the most serious limitation to which Magurno opined was limitations from migraine headaches, but the ALJ here found that Plaintiff's alleged migraine headache condition was not even a severe impairment, and Plaintiff has not challenged that finding. *See*, ALJ's decision, Tr. 1014.

[17] Insofar as Judge Larimer suggested that the opinion evidence before him at the time was "largely consistent," the undersigned respectfully disagrees.   For instance, and as Judge Larimer's decision correctly observes, Alves's opinions were not even consistent with each other, since most reflected only moderate

of the opinion evidence was the reason given by the ALJ for needing to have medical experts testify at the hearing.   Plaintiff's request to have the matter remanded solely for calculation of benefits is therefore denied.

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 10) for judgment on the pleadings is granted, and Defendant's cross-motion (ECF No. 17) for the same relief is denied.   The Commissioner's decision is reversed, and the matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.   The Clerk of the Court is directed to enter judgment for Plaintiff and close this action.

So Ordered.

Dated: Rochester, New York
       March 31, 2026

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

---

limitations, while two outliers in the middle of the period he treated Plaintiff listed more extreme limitations.